Moncure, P.
In the petition for the appeal in this case, but two errors are assigned, viz :
1st. That it was error to decree against John Dauber, or against his estate or his representatives, in favor of the administrator de bonis non of Thomas Hutchins, for any supposed failure to distribute administered assets in the hands of said Dauber as the first administrator.
2d. That Burwell as a purchaser in good faith from the devisees without notice of any outstanding debts of the estate, or unsatisfied claim upon the land purchased, *454 is fully protected by the statute in the Code, chap. 131, § 5.
I regard the first assignment of error as waived by the learned counsel of the appellants ; and it was properly waived, for it is certainly unsustainable. For, although Baylor,- as adm’r de bonis non with the will annexed of Hutchins, may not have a right, of himself, to maintain a suit against the representatives of his predecessor, for assets of the testator which that predecessor received and converted to his own use, according to the principle of the case of Wernick v. McMurdo, 5 Rand. 51; 2 Rob. Pr., old ed., p. 77; yet, as the legatees of Hutchins, who zoere entitled to maintain the suit, were parties thereto, and made no objection, and do not complain of the decree, which in fact was in their favor ; the appellants, certainly, have no right to make any such objection or complaint on that ground. If any authority were necessary to sustain so plain a proposition, the case of Morriss, adm’r v. Morriss’ adm’r, &c., 4 Gratt. 294, cited by the learned counsel of the appellees, would be full to that effect. I therefore proceed at once to notice the second, and only substantial, assignment of error in the case.
The Code, chap. 131, § 3, provides that “all real estate of any person who may hereafter die, as to which, he may die intestate, or which, though he die testate, shall not, by his will, be charged with, or devised subject to the payment of his debts, or which may remain after satisfying the debts with which it may be so charged, or subject to which it may be so devised, shall be assets for the payment of the decedent’s debts, and all lawful demands against his estate, in the order in which the personal estate of a decedent is directed to be applied.”
§ 4 provides, that “ such assets, so far as they may be in the hands of the personal representative of the decedent, may be administered by the court, in the office whereof there is or may be filed, under the 132nd chap *455 ter, a report of the accounts of such representative, and of the debts and demands against the decedent’s estate : or they may, in any case, he administered by a court of equity.”
§ 5 provides, that “ any heir or devisee who shall sell and convey any real estate which by this chapter is made assets, shall be liable to those entitled to be paid out of the said assets, for the value thereof, with interest; in such ease the estate conveyed shall not be liable, if the conveyance was bona fide, and at the time of such conveyance no suit shall have been commenced for the administration of the said assets, nor any report have been filed as aforesaid of the debts and demands of those entitled.”
The “Home Place,” devised by the third clause of the will of John Fauber to his sons FToah and Thomas, charged with the payment of the legacies given by the fourth, fifth and sixth clauses of the will, being the land sold by the said devisees to Thomas C. Burwell, the intestate of the appellants, and the subject of controversy in this case, ivas not, by the said will, charged with the payment of the testator’s debts, and was therefore, assets for the payment of said debts, under the third clause of chap. 131 of the Code, as aforesaid; and there was no suit pending for the administration of the said assets at the time of the conveyance of the said land by the said devisees to the said Burwell. The only questions arising in the case, then, are, first, whether such conveyance was bona fide; and, secondly, whether, at the time of such conveyance, any report had been filed as aforesaid of the debts and demands of those entitled. I will enquire, first, whether such conveyance was bona fide.
When John Fauber died in August 1855, he had an ample estate, real and personal, for the payment of all his debts, and then making a comfortable provision for his family. He had a small personal estate, not greater *456 in value than from one to two thousand dollars ; hut he two tracts of land, both lying in the county of Augusta, where he lived and died, and where his will was recorded ; one of them, called the “Heiskell farm,” worih about $2,700 ; and the other, called the “Home Plaee,” worth about $7,000. His family consisted of a wife, Catharine Fauber, and four children, three of them sons and adults, to wit: Hoah, Thomas and Joseph, and the other, a daughter, Xeturah, who was an infant. Like a just man and a good father, as he no doubt was, he, by his will, provided, in the first place, amply for the payment of all his debts, and then disposed of the residue of his 'estate among the members of his family, in such shares and proportions as he considered just and equal ;.and, as to some of the shares, subject to such trusts as the state of the owners of those shares seemed to him to require. After directing, by the first clause of his will, that his wife should select from all his household furniture such articles as she might choose, for the complete furnishing of a room for her and his daughter Keturah, such articles to be hers forever ; by the second clause, he provides amply for the payment of all his debts, by devoting to that purpose his Heiskell farm, and all his personal estate, other than the articles above given to his wife, directing any surplus which might remain after the payment of his debts, to be applied towards paying two of the legacies thereafter given by his will. The second clause is in these words: The judge sets out the second, third, fourth, fifth, sixth and seventh clauses of the will (see the statement of the case), and then proceeds :
How it was the plain duty of the executors, under the second clause of the will, to sell the Heiskell farm and apply the proceeds to the payment of the debts, which were sufficient in amount to cover the value of said farm, after applying to their paymentthe proceeds of sale of the personal estate, also directed by the will to be sold for *457 that purpose. And it was a plain breach of trust in the executors, to devote any part of the subject of that clause, or of the proceeds of the sale thereof, to the payment of legacies, or any other purpose than the payment of debts, until that express and main object of the clause was fully accomplished. The “Home Place” was not given by the will, exclusively and absolutely to the testator’s two sons, Hoah and Thomas, but, in effect, was given to all his family, being almost the entire residue of his estate after the payment of his debts. The mode of giving it to all his family was, by giving it to his two sons, Hoah and Thomas, equally to be divided between them, but to be charged in equal portions with the payment of the legacies given to the rest of the family. The interest of these two sons in this land, was only the surplus, after the payment of these lagacies. If they should pay the legacies, the land would be absolutely theirs. But if they should not pay them, the land was subject to be sold under a decree of a court of chancery for their payment, and the surplus only, after such payment, belonged to the devisees. They could convey to a purchaser no greater interest in the laud than they were themselves entitled to. The full measure of their interest appeared upon the face of the will from which it was derived, and a purchaser from them was necessarily fixed with notice of the nature and extent of the interest acquired by the purchase. He could, iu fact, be a purchaser only of that interest, and not of an absolute estate in the land freed and discharged from the legacies expressly charged by the will upon it. Instead of being a bona fide purchaser for value and without notice, of the land absolutely, he could not be a purchaser of it at all, but only of the interest of the devisees in it; that is the land subject to-the charges expressly imposed upon it. The devisees, as executors, had no power to sell this land; and they could, therefore, as such, make no title to it to a purchaser, however bona fide, or for whatever value. They *458 could only sell it as devisees, to the extent of the interest devised to them ; and a purchaser from them must stand s^oesJ and hold it, as they held it, subject to the legacies charged thereon. Nothing less than satisfaction those legacies to the legatees or their assigns, could relieve the land of the charge. Such was the state of the case, and such were the rights of the parties, when the transactions occurred out of which this litigation has ■arisen.
The law allowed to the executors one full year after their qualification, to enquire into and ascertain the condition of their testator’s estate, and the amount, nature and relative dignity of his debts, and to make preparation, by sales and collections, for payment of debts aud legacies, preparatory to a final settlement of the affairs of the estate. Until the expiration of a year, they could be compelled to pay the debts of their testator only in their legal order of priority, and could not be compelled to pay any of the legacies. The executors in this case doubtless knew of the existence of all, or nearly all, of the debts of their testator, and that they would require for their payment, all, or nearly all, of the subject devoted to that purpose by the second clause of the will. They certainly knew of the existence of the debt due by their testator to the estate and legatees of Thomas Hutchins, of whom he was administrator with the will annexed, which constitutes almost the entire amount for which the decree appealed from in this case was rendered. The account of John Tauber as such administrator, was settled by a commissioner of the County court of Augusta, about the time of said Tauber’s death, in August 1855 ; and shortly after his death, to wit: on the 31st of January 1856, an order was made by said court, directing said commissioner to revise said settlement, which was accordingly revised ; and the revised settlement was returned to the said court, and not being excepted to, was confirmed and ordered to be re *459 corded by the court, on the 27th of October 1856. This settlement showed the precise amount then due by the estate of John Fauber to the estate and legatees of Thomas Hutchins. A portion of this amount was after-wards paid by the executors of John Fauber, leaving due a large balance, which constitutes nearly the whole amount for which the decree appealed from was rendered as aforesaid.
On the 24th of April 1856, about eight months after the death of John Fauber, and with full knowledge of the existence of the said debt to Hutchins’ estate, and while, it seems, those to whom that debt was due were trying to collect it, the executors of John Fauber, to wit: Noah and Thomas Fauber, sold and conveyed the “Heiskell farm” to Catharine Fauber, widow of the said John Fauber, in consideration of $2,700, of which the sum of $1,200 was retained by her as an agreed satisfaction in gross of her annuity of $200 for life, under the will of her husband, the said John Fauber, and for the residue she executed her two single bills, both dated that day, and carrying interest from date; one for $500, to the said Noah and Thomas H. Faubeiy ex’ors of John Fauber, payable on demand; and the other for $1,000, to the said Noah and Thomas H., ex’ors of John Fauber, and trustees for Joseph Fauber and his family, payable twelve months after date. For these two bonds a lien was retained upon the land conveyed. And Catharine Fauber, for the consideration of $1,200 aforesaid, released to the said Noah and Thomas H., as ex’ors of John Fauber, and as devisees and legatees under his will, all her interest under the said will to the said annuity of $200 for life, and released the estate of said John Fauber from any charge for the same, and from all claim to dower or distribution. Catharine Fauber did not sign her own name to the deed, but merely made her mark; and says in her answer that she was an illiterate woman, knew nothing *460 of the debts due by her husband’s estate, and especially the debt due by him to the estate of her father, the saac^ Thomas Hutchins, and that she was deceived, and induced to make the arrangement embraced in the deed by representations made to her by her sons, the said Hoah and Thomas H. Tauber. This deed was attested by Thomas C. Burwell. Ho doubt it was attested because of the fact that it was executed by one who could not sign her own name, but had to make her mark to it. This arrangement was no doubt made by Hoah and Thomas H. Tauber for the purpose of disencumbering as much as possible the “Home Place,” devised to them, and enabling them to realize by a sale of it as large a price as possible. They contemplated by the arrangement to relieve the “Plome Place” of two, of the three, legacies charged upon it by the will, being the larger part in amount or value, and the two which involved continuing, and, to some extent, troublesome trusts, leaving to be borne by the “Home Place,” only one of the three legacies, and that of a certain amount payable at a certain time, and unembarrassed by any trust.
Hot long after that arrangement was made, to w7it: on the 21st of January 1857, Tbomás C. Burwell entered into a contract with Hoah and Thomas H. Tauber for the purchase of the- “Home l?lace,” at the sum of $7,000, payable as follows : The said Burwell sold to said Hoah and Thomas H. his entire stock of goods, &c., at cost and carriage, the amount to be ascertained by inventory. He was to pay $2,000 down in goods, at cost and carriage, and the remaining $5,000 in instalments of $1,000 annually, until paid, after deducting the remaining part of the stock of goods and accounts that said Burwell might transfer to the said Hoah and Thomas H. from the 1st, 2d, and 8d payments of $1,000 annually, deducting the interest therefrom.
Less than two months after the said contact was entered into, to wit: on the 10th of March 1857, a deed *461 was executed by Noah aud Thomas H. Tauber and the wife of the latter, conveying the said land to Burwell, in consideration of $5,377.41 in hand paid, and $1,622.59, secured by said Burwell’s obligation of that date, (the said two sums making together the sum of $7,000 aforesaid). The land is described in the deed as having been devised by the will of John Tauber to the said Noah and Thomas II., “ subject to certain charges in the said will mentioned, as will more fully appear by reference thereto.” And the grantors by the said deed, “covenaut that they will obtain from the Circuit court of Augusta, a decree exonerating said land entirely from the charges and incumbrances still binding upon it under the said will, such decree to be applied for at the next June term of said court,” and “ that they will warrant generally the property,” thereby conveyed. It does not appear how the whole of the said sum of $5,377.41 was paid. The sum of $2,000 of it seems to have been paid down, in goods, at the time of the contract. But whether the residue of $3,377.41, or any part, and if any, what part of it, was paid also in goods', is not ascertained by the rec >rd. It does appear, however, by the contract, that a further payment in goods and accounts than the said sum of $2,000 was contemplated ; indeed, that Burwell’s “ entire stock of goods,” &c.) whatever it might be, was purchased, and agreed to be taken, by Noah and Thomas H. Tauber, on account of the purchase money of the land. As to the balance of $1,622.59 mentioned in the deed, it seems to have been since applied by the purchaser to the payment of the legacy of Keturah Tauber, for which he says the amount was retained in his hands out of the said purchase money.
Noah and Thomas H. Tauber having thus disposed of the estate of their testator, left the Commonwealth, leaving unpaid the debts of their testator, which are the subject of controversy in this suit. The amount of those debts has been decreed in this case Jo be paid out of the *462 land pul-chased by Burwell as aforesaid. And the ques-ti°n we now have to solve is, whether or not that decree is erroneous.
That Noah and Thomas H. Fauber, executors of John E'auber, were guilty of a plain and palpable breach of trust, in diverting the trust subject created by the second clause of their testator’s will, from the payment of his debts, to which it was devoted by the will, and applying it to the payment of legacies expressly charged by the will on land devised to them in their own right, is a matter beyond all controversy. And if that land had never heen aliened by them ; if the title in law and equity yet remained vested in them, as it was given to them by the will; nothing in law can, I suppose, be more certain, than that the said land would be now liable for the payment of the said debts yet remaining unpaid. The executors had a right, and it was their duty, to sell the “ Heiskell farm” for the payment of their testator’s debts; and if they had sold the said land to a bona fide purchaser, and received from him the purchase money, he would not have been hound to see to its appplication ; and his title could not have been questioned, even though the money had been misapplied. But they had no l-ight to apply that farm, or the proceeds of the sale of it, to-the payment- of legacies, chai-ged upon the home place, at least until all the debts were paid ; and if they sold the Heiskell farm for the express purpose of paying the legacies instead of the debts, the right of the creditors, in equity, to interpose and arrest the proceeds of sale before being applied to the payment of legacies, and have them applied to the payment of debts; or to be subrogated to the place of the legatees, and be paid out of the proceeds of sale of the home place, if those legatees had received payment out of the proceeds of sale of the Heiskell farm, rests upon the plainest and best established principles of the law. Such would be the state of things, and such the *463 relative rights of the parties, if Noah and Thomas H. Fauber had not aliened the home place.
But those devisees having sold and conveyed the land devised to them to Thomas C. Burwell as aforesaid, is he entitled to hold it against the claims of the creditors 1
He claims to be so entitled as a bona fide pui’chaser.
Certainly a bona fide purchaser for value, and without notice, is a great favorite of a court of equity, and that' court will not disarm such a purchaser of a legal advantage.
But we must not permit ourselves to be misled by words or maxims in this matter. Other persons are entitled to the protection and the favor of a court of equity as well as purchasers. Creditors are such persons, especially when they are, as sometimes, and in this case, in fact, they are or were, infants, feme coverts and nonresidents. Purchasers are bound to use a due degree of caution iu making their purchases, or they will not be entitled to protection. Caveat emptor is one of the best settled maxims of the law, and applies exclusively to a purchaser. He must take care, and make due enquiries, or he may not be a bona fide purchaser. He is bound, not only by actual, but also by constructive notice, which is the same in its effect as actual notice. He must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information, and then say he is a bona fide purchaser without notice. The law on this subject of constructive notice is laid down with great clearness by a very great judge, Vice Chancellor Wigram, in Jones v. Smith, 1 Hare R. 43, 55, 23 Eng. Ch. R. cited by the learned counsel for the appellees. See also Le Neve v. Le Neve, and the notes thereto in second Leading Cases in Equity, Pt. 1, p. 23, marg. 127 top; and Brush v. Ware &c., 15 Peters. U. S. R. 93-114; also cited by the *464 same counsel. In the case last cited, the Supreme court, *n an 0pini°a delivered by Mr. Justice McLean for the whole court, held, that “no principle is better established than that a purchaser must look to every part of the title essential to its validity. The law requires reasonable diligence in a purchaser to ascertain any defect of title. But when such defect is brought to his knowledge, no inconvenience will excuse him from the utmost scrutiny. He is a voluntary purchaser, and having notice of a fact which casts doubt upon the validity of his title, are the rights of innocent persons to be prejudiced through his negligence? ” Id. p. 111, 112. “"Why,” asked the court, “ ivas not the defendant bound to search for the will ? The answer given is, the distance was too great, and the place where the will could be found was not stated on the warrant, or on any of the other papers. That mere distance shall excuse enquiry in such a case, would be a new principle in the law of notice.”
That Burwell had actual notice of the will of John Fauber and its contents is perfectly certain.- That he would necessarily have had constructive, if he had not had actual notice of the same, is just as certain. That will was the source from which his title was derived; and he was bound to take notice of it and all its contents. He had constructive notice of every fact apparently affecting the title to the land, to which the will refers, and he was bound to enquire into such fact and fully inform himself on the subject. He had actual notice of the deed and its contents from John Fauber’s executors to Catharine Fauber conveying the Heiskell farm, not because he was an attesting witness to that deed, but because he relics on it in his defence, and must have known its contents. Knowing the contents of the will, he therefore knew that Uoah and Thomas H. Fauber held the home place subject to the legacies charged thereon by the will, and that in becoming a purchaser of that place from them, he acquired, and could acquire, only their *465 interest in it; that is, the land subject to the charges imposed thereon by the will, just as it was held by his vendors. So that instead of being a bona fide purchaser of the land, he was not a purchaser of it at all free of those charges. In fact the deed to him for the land expressly describes it as subject to those charges. But it is said for him, that he was informed by the deed from John Fauber’s ex’ors to Catharine Fauber for the Heiskell farm, that two of the said charges, to wit: the legacy to her and the legacy to Joseph Fauber and family, were satisfied or secured by means of the sale of the Heiskell farm. How the second clause of the will of John Fauber, of which he had notice, expressly devoted the Heiskell farm to the payment of the testator’s debts, and directs only any possibly remaining surplus of the proceeds of the sale thereof, after the payment of debts, to be applied towards the payment of the legacies given to Keturah, and' Joseph and family (not including the legacy to Catharine Fauber). But Burwell says in his answer, that at the time of the conveyance of the home place to him, “ respondent had no notice or knowledge of the existence of the claim now asserted in this case and that prior to the purchase made by him, “he may have been, and probably was, aware of the fact, that John Fauber had been in his life time administrator or executor of Thomas Hutchins ; but respondent certainly had no knowledge of the state of his accouuts as such administrator or executor. After the death of the said John Fauber, and the qualification of his executors, the first knowledge which respondent had of any of their transactions was, that on or about the 24th day of April 1856, he was called upon to attest as a witness, a deed between the exeeutors and the widow of the said Fauber, in relation to a sale of some of the real estate. That deed is duly recorded in the County court of Augusta, and will show for itself. From this time until in January 1857, (when *466 he purchased the home place,) respondent had no occasion to enquire anything about the condition of the estate of Thomas Hutchins, or that of John Fauber, and, in fact, knew nothing of either.” How was not Burwell bound to inform himself on the subject, according to the best settled principles of the law, and were not the means of information readily accessible to him ? I think so. Undoubtedly the pecuniary legatees had all of them a right to look to the home place for payment of their legacies, which remained charged thereon unless and until they were otherwise satisfied. The only satisfaction ever pretended of any of them was, in regard to the legacies to Catharine Fauber and Joseph Fauber and family, provided for in the sale of the Heiskell farm as aforesaid. "Whether that was a valid satisfaction or not, plainly depended upon whether the proceeds of the sale of the Heiskell farm were sufficient for their satisfaction, after paying all the debts of John Fauber, which by his will were primarily and expressly charged on said farm. How here the will, -while it did not disclose in numero the amount of the testator’s debts, yet expressly refers to a subject vitally affecting the title of the devisees of the home place, into which subject the purchaser, Burwell, -was bound to enquire. He had no right to shut his eyes and say : “I have no occasion to enquire anything about the condition of the estate of Thomas Hutchins, or that of John Fauber.” That was the very thing about which he had occasion to enquire. He was not bound to make the purchase. He could only be a voluntary purchaser. And he could effectually guard himself against all danger, by making due enquiry. Is it not better that he should be required to do this, than that he should be permitted to shut his eyes, make the purchase blindly, and thereby involve in loss innocent creditors, who may be, as in fact in this case they were, infants, feme coverts and non-residents, and of course unable to take care of themselves ? The authorities before re *467 ferred to decide that he was bound to make such enquiry. It was manifest from the will that the testator owed a large amount of debts, equal or nearly so, in his estimation, to the value of the Heiskell farm, and the personal estate subjected to their payment. And when his executors, in about eight months after his death, sold and conveyed that farm, not for the payment of his debts, but for the express purpose chiefly, of paying legacies expressly charged by the will on the home place devised to them subject to the charge, was not this a matter of which the purchaser of the home place, Burwell, had notice ; and which should have led to further enquiry by him, according to the principle laid down by Wigram, V. C., as aforesaid? “Was it not a fact,” as the Supreme court said in Brush v. Ware, &c., before referred to, “ essentially connected with the title purchased by the defendant, which should have put him upon enquiry. If it would do this it was notice ; for whatever shall put a prudent man on enquiry is sufficient; and this rule is founded on sound reason, as well as law. How can an individual claim as an innocent purchaser under such a circumstance ? ” 15 Peters. U. S. R. 93, 112. Burwell made no enquiry whatever. He did not even ask the executors a single question on the subject. Nothing was easier than for him to have obtained the fullest information. The means of information were readily accessible, and right at hand. They were not, as in the case in 15 Peters., in a remote and uncertain place and in another State. They were of record in the very court in which the will under which he claimed title w’as recorded, and in the very county in wnieh the land purchased by him was situated. On the 27th of October 1856, less than three months before he made the purchase, the settled account of John Fauber, as adm’r, with the will annexed of Thomas Hutchins, clearly showing almost the entire debt due by John Fauber’s estate, was ordered to be recorded by the County court of Augusta. When he *468 made that purchase the agent or attorney of those to whom that debt was due must have been actually engaged in an effort to collect it; for in the next month after the execution of the deed to Burwell for the home place, to wit: the 23d of April 1857, the bill in this suit was filed by Baylor as adm’r de bonis non, with the will annexed of Hutchins, for the recovery of that debt, in which bill the plaintiff sets out the means he had in vain used to collect it. The wonder is, not so much why Burwell did not inform himself of these facts by enquiry, as how he could have kept from knowing them. One word spoken to the executors would have brought to him a knowledge of them all; and yet he did not speak that word. The wonder is, how it happened that such knowledge did not reach him even without that spoken word. A question might, perhaps, be raised in this case, if it were necessary, whether the case does not come under both of the categories embraced in the principle as laid down by Wigram, V. 0., as aforesaid; that is, whether, 1st, the purchaser, not only had constructive notice of facts to a knowledge of which he would have been led by an enquiry into circumstances affecting the property of which he had actual notice ; and whether, 2dly, he did not designedly abstain from enquiry for the very purpose of avoiding notice. It certainly, I think, comes under the former, which is enough for the purposes of the case. The latter alternative has been reluctantly applied by the court, as is said by the Vice Chancellor, and I would be indisposed to apply it in this ease. My opinion rather is that Burwell instead of troubling himself to enquire into the affairs of John Fauber’s estate, and as to the amount of debts which it owed, chose to rely on the covenant of his vendors contained in the deed, to relieve the land purchased by him of the incumbrance of the legacies charged upon it, and to warrant the title generally against all claims and demands. The grantors expressly and specially covenant in the deed “that they will obtain *469 from the Circuit court of Augusta, a decree exonerating said land entirely from the charges and incumbrances still binding upon it under the said will, such decree to be applied for at the next June term of said court.” Such a decree was never obtained ; and it does not appear that it was ever applied for. Burwell was no doubt willing to run the risk of his vendor’s not complying with their e wenant, for the sake of the advantages which he hoped to derive from his arrangement with them. And he ought not now to be permitted to shift the damages arising from the breach of that covenant, from his own shoulders to those of the creditors of John Fauber.
How then does the case stand upon the law and the facts as they seem to exist ?
John Fauber owned two tracts of laud, the Heiskell farm and the home place. He owed debts about equal in amount to the value of the Heiskell farm ; and had a family consisting of a wife, three sons and a daughter. By his will he directed the Heiskill farm to be sold, and the proceeds of sale applied to the payment of his debts ; devised the home place to his two sons, Noah and Thomas, charged with the payment of legacies to. his wife and other two children ; and appointed his sons, Noah and Thomas, his executors. In about eight months after his death, his executors sold and conveyed the Heiskell farm to his widow for $2,700, agreeing to apply $2,200 of the purchase money to the payment of two of the three legacies given by the will, to wit: the legacies to his wife and to his son Joseph ; and the same has been accordingly so applied, leaving unpaid debts of the testator to about an equal amount. Shortly after the executors made that sale, they, as devisees, sold and conveyed the home place, devised to them, to Thomas C. Burwell for $7,000, a large portion of it payable in goods, and the vendors covenanting to relieve the land of the incumbrance of the legacies, and to obtain a decree for that purpose, and to warrant the title generally. At the *470 time of the sale and conveyance to Burwell, he had notice, actual or constructive, that the two legacies to Catharine and Joseph Fauber wrere paid or provided for out of the proceeds of the sale of the Heiskell farm which had been devoted by the testator to the payment 0f His debts, and that the debts now claimed in this suit then remained unpaid. The unpaid creditors of John Fauber brought this suit to recover the amount due them,from those who might be legally bound therefor upon the facts of the case. The court below first decreed the payment of them (except a very small amount) by the sureties of John Fauber as administrator with the will annexed of Thomas Hutchins, deceased, on account of the administration of whose estate those'debts (exceptas aforesaid) were due; and the said sureties, or two of them, having paid the amount, they claimed to recover it over against the party or subject ultimately bound therefor ; and the court below gave them a decree against Burwell and the home place bought by him ; and also gave a decree against the same for another small debt of the estate of John Fauber still remaining unpaid. Is that decree right ? I think it is.
The legatees, or two of them, having received payment of their legacies out of the fund which belonged to the creditors, the latter had a clear and plain right to compel the former to refund the money, so far as it was necessary for the payment of the debts. And the legatees, being thus disappointed in obtaining satisfaction out of the fund which belonged to the creditors, would have as clear and plain a right to be reinstated in their charge upon the home place, and to be satisfied out of the same. But, to avoid circuity, a court of equity will subrogate the creditors to the place of the legatees, and. give the former a direct decree against the home place. This is a simple process daily pursued in courts of equity.
The only possible difficulty in the case is at once removed when it is shown, as I think has conclusively *471 been done, that Burwell was not a bona fide purchaser without notice.
The release given by Catharine Fauber in the deed to her for the Heiskell farm can make no difference. The consideration for that release having wholly failed, it cannot stand in the way of her right to have satisfaction of her legacy out of the home place charged therewith by the will. The sum agreed to be paid to her in gross as compensation for her annuity for life, seems to have been considered a reasonable equivalent therefor, and no objection has been made to it from any quarter. Twelve hundred dollars may therefore be assumed as the amount or value of her legacy At all events, that amount was paid out of the proceeds of the sale of the Heiskell farm on account of that legacy. As to the amount of the legacy of $1,000 to Joseph Fauber and family paid out of the proceeds of sale of the Heiskell farm by decree of the court below, there can be no possible doubt of the right of the creditors to a decree against the home place to the extent of that amount, which (including interest) is not greatly less than the whole amount of the unpaid debts. Joseph Fauber gave no release of his legacy, as Catharine Fauber did; and his legacy had not been actually paid out of the proceeds of the Heiskell farm when this suit was brought. It would have been an easy matter, therefore, to have had that legacy charged upon the home place, leaving the money which he was to have received out of the Heiskell farm to be paid to the creditors. But the court having decreed the payment of the legacy to Joseph Fauber out of the proceeds of the Heiskell farm, the right of the creditors to subrogation and satisfaction to that extent out of the home place would have been self evident. There can be no doubt, however, for the reason before stated, that the right of the creditors to subrogation and satisfaction extends to the whole amount due them.
It may be proper to state that I think the record shows *472 that John Tauber’s executors are not indebted on account' his personal estate. Though no ■ account was ever se^^e(^ fey them, so as to show that any thing, and if any thing, what amount is due them ; yet it is sufficiently shown in the case that they owe nothing on that account, and there can therefore be no ground for making the-sureties for their administration of their testator’s-estate liable for an amount claimed in this case, or any part thereof.
My opinion upon the question, whether the conveyance of the home place to Harwell was bona fide, renders it unnecessary to consider the question, whether at the time of such conveyance, any report had been filed as-aforesaid of the debts and demands of those entitled ; and I therefore refrain from doing so.
Upon the whole, I am of opinion that there is no error in the decree appealed from, and that it ought to be affirmed.